IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LAURA CINTRON<br>962 Harding highway<br>PO Box 585<br>Buena, NJ 08310<br><br>v.<br><br>THE STATE OF NEW JERSEY<br>301 Spring Garden Road<br>Hammonton, NJ 08037<br>  and<br>THE STATE OF NEW JERSEY,<br>DEPARTMENT OF HUMAN SERVICES,<br>DIVISION OF MENTAL HEALTH<br>SERVICES<br>301 Spring Garden Road<br>Hammonton, NJ 08037<br>  and<br>ANCORA PSYCHIATRIC HOSPITAL<br>301 Spring Garden Road<br>Hammonton, NJ 08037 | Civil Action No.:<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

### NATURE OF THE ACTION

This is an action under Title VII of the Civil Rights Act of 1964, Title I of the Civil Rights' Act of 1991,and the New Jersey Law Against Discrimination (LAD) N.J.S.A. 10:5-1 et. seq. to correct unlawful employment practices that discriminate on the basis of sex and to provide appropriate relief to Laura Cintron who was adversely affected by such practices. During her employment with Defendants, Ms. Cintron was subjected to sexual harassment and hostile work environment by Defendants' employees and/or agents including but not limited to her supervisor, Alfred Filippini, through regular, sexually explicit, insulting, and derogatory comments and conduct, including but not limited to sexually explicit questions, comments,

physical gestures and sexually charges physical contact which created a sexually hostile and offensive work environment for her as a female. Ms. Cintron made complaint of the sexual harassment, and disparate treatment based on her gender, and was reprimanded for her complaints.  In further retaliation for Ms. Cintron's complaints, Defendants by and through the actions of their employees and/or agents began unreasonably and without basis criticizing her work, denying her overtime and threatening her job.  Defendants by and through the actions and/or inactions of their agents and/or employees also created an out of control work environment for Ms. Cintron in violation of her protected rights and in retaliation for Ms. Cintron's complaints.

As a result of the discriminatory, harassing and hostile work environment and retaliation, Ms. Cintron was caused to suffer extreme emotional distress with physical manifestations, and was required to seek medical and psychological treatment.  Upon undergoing such treatment, Ms. Cintron was forced to take a several short leaves of absence from her employment with the Defendants, in order to preserve her health.

The discriminatory harassing and retaliating actions taken against Ms. Cintron resulted in monetary damage as well as severe emotional distress, requiring her to be placed under medical supervision, and also causing damages that include, but are  not limited to, humiliation, anxiety and other physical ailments and emotional damages.  Defendants' conduct is so egregious and outrageous and intentional, that Plaintiff seeks punitive damages.  Plaintiff also brings pendent state law claims.

Plaintiff duly and timely filed her charge of discrimination with the Equal Employment Opportunity Commission on November 24, 2008 and dual filed with the New Jersey Division on Civil Rights.   Plaintiff has complied with all statutory requirements, and this matter is ripe for

private civil action. More than one year has passed since the filing of the charges of discrimination with the New Jersey Division on Civil Rights, and Plaintiff has received her right to sue from the EEOC. See a true and correct copy of the right to sue letter, attached as Exhibit "A."

## JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 45 l, 1331, 1337, 1343 and 1345. This action is authorized and instituted pursuant to § 706(f) (1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5(f)(1) and (3)" ("Title VII") and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981A.

2. The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of New Jersey.

3. Jurisdiction over the state law claims is conferred upon this court by virtue of the Judicial Improvements Act of 1990, 28 U.S.C. § 1367.

## PARTIES

4. Plaintiff Laura Cintron is an adult individual and a citizen of the State of New Jersey, residing therein in Buena, New Jersey.

5. Defendant, State of New Jersey is a government entity. The State of New Jersey owns, operates and controls the Ancora Psychiatric Hospital, where Plaintiff is employed.

6. Defendant State of New Jersey Department of Human Services Division of Mental Health Services, is a state health organization that employs more than 15 employees. The State of New Jersey Department of Human Services Division of Mental Health operates and controls the Ancora Psychiatric Hospital, where Plaintiff is employed.

7. Defendant State of New Jersey Department of Human Services Division of

Mental Health Services, is a public entity duly organized and existing pursuant to the laws of the State of New Jersey.

8. At all relevant times, State of New Jersey Department of Human Services Division of Mental Health Services has continuously been and is now doing business in the State of New Jersey and have continuously had at least fifteen (15) employees.

9. At all relevant times, State of New Jersey Department of Human Services Division of Mental Health Services has continuously been an employer engaged in an industry effecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

10. Defendant Ancora Psychiatric Hospital, is a state mental health hospital that employs more than 15 employees.

11. At all relevant times, Ancora Psychiatric Hospital has continuously been and is now doing business in the State of New Jersey and have continuously had at least fifteen (15) employees.

12. At all relevant times, Ancora Psychiatric Hospital has continuously been an employer engaged in an industry effecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

13. At all times material hereto, Plaintiff Laura Cintron, was employed by Defendants at the Ancora Psychiatric Hospital.

## STATEMENT OF CLAIMS

14. Ms. Cintron has been continuously employed by Defendants since on or about November 18, 1993.  She is currently employed as a Personnel Aide I.

15. Beginning on or about January 25, 2008, and continuing through the present,

Defendant, by and through its employees, agents, contractor and/or servants including but not limited to her supervisor, Alfred Filippini, engaged in unlawful employment practices at the Ancora Psychiatric Hospital, in violation of Section 703(a) (l) of Title VII, 42 U.S.C. § 2000e-2(a) (t) and 2000 (e)-3 (a) (1) and of the New Jersey Law Against Discrimination, by subjecting Plaintiff Laura Cintron to a hostile work environment and quid pro quo sexual harassment and then retaliation.

16.     During her employment with Defendants, at Angora Psychiatric Hospital, Plaintiff was subjected to quid pro quo sexual harassment and a sexually hostile work environment by other employees including but not limited to her supervisor, Alfred Filippini, the head of the Human Resources Department, which included by was not limited touching Plaintiff inappropriately and without her permission.  Defendants knew or should have known of the harassing/ discriminating/ hostile work environment to which Plaintiff was being subjected by their employees and/or agents including but not limited to limited to her supervisor, Alfred Filippini.  Despite being repeatedly told by the Plaintiff to stop, this harassing, discriminating and hostile behavior, Defendants employees and/or agents including but not limited to her supervisor, Alfred Filippini continued the harassment and discrimination.  Upon reporting of the offensive behavior, Plaintiff suffered greater harassment, discrimination and retaliation.

17.     On or about January 15, 2008, Mr. Filippini, without warning grabbed Ms. Cintron's hair, ran his hands through it and remarked  "it's so thick."  Immediately, Ms. Cintron asked him to stop and told him that his behavior bothered her.  This incident occurred in Mona Fredlund's office while Plaintiff was assisting her in creating an Excel document, and Ms. Fredlund observed Mr. Filippini's inappropriate conduct.   Ms. Fredlund is one of Plaintiff's supervisors.  Following this incident, Ms. Cintron reported the offensive behavior to Ms. Carr.

Ms. Carr stated that Mr. Filippini was touchy that way and probably did not mean anything by his behavior.

18.     On or about January 23, 2008, at approximately 2:45 p.m., Mr. Filippini requested Ms. Cintron's assistance in using the fax machine.  As Ms. Cintron began to fax the document, Mr. Filippini stated the number was incorrect.  This as Ms. Cintron looked for the number on the bulletin board, she felt Mr. Filippini press himself into her buttocks, pinning her against a table.  After the fax transmitted, Ms. Cintron was returned to her office.  Ms. Cintron was extremely upset about Mr. Filippini's actions.

19.     On or about January 24, 2008, Ms. Cintron reported Mr. Filippini's offensive behavior the day before to Ms. Fredlund, her supervisor.

20.     Later, on or about January 24, 2008, Mr. Filippini came into Ms. Cintron's office with another fax and smiled inappropriately towards her.  Another employee, Britta Preslery, responded to him and faxed the document.

21.     On or about Monday, January 28, 2008, Ms. Cintron reported Mr. Filippini's harassing behavior to Ms. Carr, another supervisor.

22.     Following this meeting, Ms. Cintron was left alone in an office with Mr. Filippini and Sandy Justice, a Senior Clerk Transcriber.  Ms. Justice later recalled a similar instance where Mr. Filippini pressed up against her too.

23.     On or about February 8, 2008, Plaintiff received a memorandum from Mr. Lubitsky, Deputy CEO which instructed her not to discuss the events with anyone else.

24.     From on or about February 11, 2008 up to and including February 20, 2008, Ms. Fredlund initiated several conversations with Ms. Cintron regarding Mr. Filippini.  Ms. Fredlund told Ms. Cintron that he was scared, he felt bad and he might lose his job, referring to Mr.

Filippini.

25. On or about February 18, 2008, Ms. Fredlund informed Plaintiff that Lavina Miller would not be assisting her with the Sick Leave Injury Assignments, which increased Ms. Cintron's workload substantially.

26. On or about February 20, 2008, Ms. Cintron was interviewed by two Human Services Police Detectives regarding her complaints of harassment. The officers stated they were investigating to see whether criminal charges were warranted. Ms. Cintron's supervisor, Ms. Fredlund, was present during this interview. After the interview concluded, Ms. Fredlund instructed Ms. Cintron not to file a criminal complaint against Mr. Filippini. Ms. Fredlund stated that Ms. Cintron did not want to be responsible for ruining his life.

27. On or about February 21, 2008, at approximately 2:55 p.m., Mr. Filippini stood outside Ms. Cintron's office and stared at her. This behavior intimidated Ms. Cintron. Because of Mr. Filippini's actions, Ms. Cintron felt physically uneasy, her heart began racing and she started to shake. Ms. Cintron attempted to contact her supervisor via telephone, but she did not answer.

28. After Mr. Filippini left, Ms. Cintron immediately went to her supervisor, Ms. Fredlund, and informed her of what just took place. Ms. Fredlund sat with her until Mr. Filippini left for the day. Ms. Fredlund also informed Ms. Cintron that Mr. Lubitsky would not move Mr. Filippini's office location.

29. On or about February 26, 2008, Mr. Filippini went to Tina Bailey's office, located next to Ms. Cintron's office. Instead of conversing with Ms. Bailey in her office, Mr. Filippini stood outside the doorway, where Ms. Cintron could see him, and periodically would look into Ms. Cintron's office and smile. He also engaged in similar behavior on or about February 28,

2008.

30. From March 10, 2008 up to and including March 14, 2008, Ms. Cintron took a leave of absence due to the emotional distress she experienced as a result of the harassment and/or retaliation she was subjected to by Defendants' employees.

31. On or about March 12, 2008, Mr. Filippini was removed from the office.

32. Even though, Mr. Filippini was in a different office, he continued to harass Ms. Cintron. On several occasions from on or about April 9, 2008 until on or about August 7, 2008, he would stand outside her office door and looking at her, which he knew would make her uncomfortable and cause her to have a panic attack.

33. On August 7, 2008, everyone was moved to Sycamore Hall. Mr. Filippini again worked in the same building as Ms. Cintron.

34. On or about August 20, 2008, Ms. Cintron was forced to attend a meeting where Mr. Filippini was present. During this meeting, Mr. Lupitski addressed Ms. Cintron in a rude manner in front of her colleagues. Ms. Cintron asserts this was done in retaliation for her complaints of harassment.

35. On or about September 8, 2008, Ms. Fredlund requested Ms. Cintron submit a doctor's note, for a September 4, 2008 absence, even though she was not on "proof of illness" status.

36. On or about September 12, 2008, Ms. Cintron was approached by Mr. Filippini in a way that made her feel threatened and uncomfortable.

37. Also, on or about September 12, 2008, Ms. Cintron sent an e-mail to Mr. Lubitsky and Ms. Carr where she stated that the current situation with Mr. Filippini was affecting her health.

38. On or about September 25, 2008, Ms. Carr informed Ms. Cintron that a staff meeting was being held in Mr. Filippini's office. Ms. Cintron stated to Ms. Carr she could not be in an enclosed room with him because she began to tremble and cry uncontrollably. After this conversation, Ms. Cintron was so upset she went ot the infirmary. When she returned later, Ms. Carr reprimanded her for going to the infirmary without telling anyone.

39. On or about September 29, 2008, Ms. Cintron attended a meeting in Ms. Carr's office. Ms. Cintron was originally told this meeting would be about outsourcing some assignments. Instead, Ms. Carr began discussing alleged problems with Ms. Cintron's performance, her schedule and her alleged lateness. Ms. Cintron was not previously reprimanded regarding these issues. Ms. Cintron believes she received these criticisms in retaliation for reporting the harassment, for not attending the meeting in Mr. Filippini's office and for her report of the harassment.

40. On or about September 30, 2008, Ms. Carr presented Ms. Cintron with a schedule to begin on October 1, 2008.

41. On or about October 1, 2008, Ms. Carr began closely monitoring Ms. Cintron's actions at work. Other employees were confronted for talking to Ms. Cintron. Ms. Cintron felt targeted and believed this was in retaliation for complaining about the harassment.

42. From approximately October 2, 2008 through October 26, 2008, Ms. Cintron took a medical leave of absence on her doctor's recommendation as a result of the stress arising from the retaliation.

43. On or about October 27, 2008, Ms. Cintron returned to work to find that no one else from the Human Resources department filled in while she was gone causing an extreme backlog in work.

44. After she returned to work, Mr. Filippini continued to make visits to her work area. This further exaggerated Ms. Cintron's medical condition. Ms. Cintron felt this was done in further retaliation for her complaints of harassment.

45. Ms. Cintron was so affected by this, she took another leave of absence beginning on or about November 3, 2008. She returned to work on or about November 11, 2008.

46. On or about November 21, 2008, Mr. Filippini came to Ms. Cintron's office on several occasions. On one occasion, Mr. Fillippini yelled for Ms. Cintron and told her that someone was asking for her. When Ms. Cintron investigated, she discintroned that the individual was asking for another employee, Jean Juliano.

47. Also on or about November 21, 2008, she was informed that Mr. Filippini would be proofreading an article she wrote for the employee news letter. She was told he had to do this for legality reasons.

48. In addition, on or about November 21, 2008, Ms. Fredlund denied Ms. Cintron's request to work overtime. Other employees were still granted overtime hours. Ms. Cintron was denied her request to work overtime hours on several occasions, however other employees, who did not report harassment, were allowed to work overtime.

50. On or about December 4, 2008, Ms. Cintron became emotionally distressed when she came into contact with Mr. Filippini at work. She left a message for Ms. Fredlund stating that she did not feel well and had to leave. Later she received a phone call from Ms. Fredlund reprimanding her for allegedly not following protocol. When Ms. Cintron mentioned, during the conversation, that she was waiting for a phone call from her doctor regarding medication, Ms. Fredlund made condescending comments about Ms. Cintron forgetting to take her medication.

51. On or about December 5, 2008, Ms. Cintron was instructed to bring in a doctor's note.

52. On or about December 8, 2008, Ms. Cintron requested "Comp Time" in lieu of overtime. This request was denied. She was told that no compensatory time was being approved. However, other employees, who had not reported harassment, were receiving compensatory time.

53. Upon Plaintiff's complaints of sexual harassment, discrimination and hostile work environment, Defendants, by and through their agents, servants, employees and workmen, failed to fully, adequately and sufficiently investigate, curb, rectify or control, the offensive behavior, discrimination, sexual harassment and hostile environment created and committed by its employees, agents, servants, workmen and contractors and failed to act in accordance with law and responsibility to care for and protect their employees from sexual harassment and hostile work environment and retaliation.

54. In retaliation for Plaintiff's complaint of sexual harassment, discrimination, hostile work environment and retaliation, Plaintiff was subjected retaliation including but not limited to, baseless criticism of her work, being denied overtime and being denied compensation time. Defendants' conduct by and through their employees, agents, workmen and contractor, including but not limited to Mr. Filippini, Ms. Carr, Mr. Lubitsky and Ms. Fredlund harmed Plaintiff physically and mentally. As a result, Plaintiff was placed on intermittent medical leave.

55. This sexual harassment/ hostile work environment/discrimination and retaliation was committed/created/aided/ abetted/fostered by Defendants' employees, agents, workmen and contractors, including her supervisors, Mr. Filippini, Ms. Carr, Mr. Lubitsky and Ms. Fredlund, who possessed and exercised power and control over the terms and conditions of Plaintiff's employment. The sexual harassment/hostile work environment/discrimination and retaliation were reported to the Defendants' management, who either refused to take any action and/or failed to take appropriate, immediate action to stop the harassment and discrimination and created an

out of control workplace for Plaintiff in retaliation for her report of and complaint of the discrimination/harassment and hostile work environment.  The sexual harassment/hostile work environment resulted in the Plaintiff having to take intermittent medical leaves of absence from employment with the Defendants, as she became unable to tolerate the continued discrimination/harassment and was required to do so in order to preserve her physical and mental health.

56.     As a result of the sexual harassment/hostile work environment and her report of/objection to such, Plaintiff was required to endure constant comments and negative actions taken against her by her supervisors, including but not limited to Mr. Filippini, Ms. Carr, Mr. Lubitsky and Ms. Fredlund, who possessed and exercised power and control over the terms and conditions of Plaintiff's employment.  This created an employment environment which caused Plaintiff to continue to suffer from extreme stress, anxiety, humiliation among other injuries.  Further Defendants failed to control their agents and employees including but not limited to her supervisors, Mr. Filippini, Ms. Carr, Mr. Lubitsky and Ms. Fredlund,  who possessed and exercised power and control over the terms and conditions of Plaintiff's employment, despite Plaintiff's complaints, forcing Plaintiff to take intermittent medical leaves of absence from her employment with Defendants.

57.     Although Defendants had a written discrimination policies, they failed to properly, adequately, and effectively supervise, manage, and control their employees, servants, contractors and workmen, including but not limited to her supervisors, Mr. Filippini, Ms. Carr, Mr. Lubitsky and Ms. Fredlund, who possessed and exercised power and control over the terms and conditions of Plaintiff's employment, and its human resources department which failure in turn resulted in Plaintiff being forced to endure unlawful, offensive and pervasive sexual harassment and hostile work environment, and retaliation, as above-described, causing great harm to Plaintiff.

58. The unlawful employment practices complained of in the preceding paragraphs were done with malice or with reckless indifference to the protected rights of Laura Cintron as a female.

## LEGAL ALLEGATIONS

### Count I
### Unlawful Gender Discrimination in Violation of
### Title VII of the Civil Rights Act of l964 as
### Amended by the Civil Rights Act of 1991.

59. Plaintiff hereby incorporates by reference the preceding paragraphs of this Complaint, inclusive, as though each were set forth at length herein.

60. Defendants are employers within the meaning of 42 U.S.C. §§ 2000e(a) and (b).

61. Title VII of the Civil Rights Act of 1964 as amended in 1991, and the regulations promulgated thereunder make it an unlawful employment practice for an employer to discriminate against any individual with respect to the terms and conditions or privileges of employment on the basis of gender. 42 U.S.C. §§ 2000e-2(a)(1).

62. Defendants intentionally discriminated against Plaintiff by committing a course of conduct and/or placing the Plaintiff in the path of such conduct, including but not limited to the above-described, which also created a hostile work environment and was carried out in retaliation against Plaintiff for her complaints for harassment and discrimination.

63. Defendants knew or should have known that their employment practices had created a sexually charged work environment which was hostile and harassing to female employees, including the plaintiff, and failed to stop, continued, and/or encouraged the above described discriminatory practices thus aiding and abetting the quid pro quo sexual harassment by its agents, servants, contractors, workmen, supervisors, managers and employees in violation of law.

64. As a direct and/or proximate result of the above-described discriminatory actions of Defendants, Plaintiff suffered financial injury including but not limited to past loss of earnings, future loss of earnings, loss of earning potential, loss of benefits.

65. As a direct and/or proximate result of the above-described discriminatory actions of Defendants, Plaintiff suffered severe emotional and mental injuries, including but not limited to past and present pain and suffering, humiliation, depression, anxiety, and embarrassment, which required her to seek medical treatment.

66. As a direct and/or proximate result of the above-described discriminatory conduct, Plaintiff suffered physical and emotional injury requiring medical treatment.

67. As a direct and/or proximate result of Defendants' discriminatory conduct, Plaintiff suffered professional injuries, including but not limited to injuries to her professional development.

68. Plaintiff seeks all remedies available to her pursuant to Section 1981a.

## Count II
### Violations Under the New Jersey Law Against Discrimination

69. Plaintiff hereby incorporates by reference the preceding paragraphs of this complaint as though each were set forth at length herein.

70. Defendants' course of unlawful conduct as above-described discriminated against Plaintiff solely on the basis of her gender creating a hostile work environment and retaliating against Plaintiff for her complaints of discrimination/harassment and hostile work environment in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1, et.seq..

71. Defendants knew or should have known that their employment practices had a created a sexually charged work environment which was hostile and harassing to female employees, including the plaintiff, and that they: failed to stop, continued, and/or encouraged the

above described discriminatory practice thus aiding and abetting the quid pro quo sexual harassment by its agents, servants, contractors, workmen, supervisors, managers and employees in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1, et.seq..

72. As a direct and/or proximate result of the above-described discriminatory actions of Defendants, Plaintiff suffered financial injury including but not limited to past loss of earnings, future loss of earnings, loss of earning potential, loss of benefits.

73. As a direct and/or proximate result of the above-described discriminatory actions of Defendants, Plaintiff suffered severe emotional and mental injuries, including but not limited to past and present pain and suffering, humiliation, depression, anxiety, and embarrassment, which required her to seek medical treatment.

74. As a direct and/or proximate result of Defendants' discriminatory conduct, Plaintiff suffered professional injuries, including but not limited to injuries her professional development, loss of potential promotions and damage to her professional reputation.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial in this matter.

## REQUESTED RELIEF

WHEREFORE, Plaintiff Laura Cintron respectfully prays that this Court award the following relief:

a. Exercise jurisdiction over this matter;

b. Issue declaratory and injunctive relief finding that the above-described practices are unlawful and enjoining their past and continued effects;

c. Award Plaintiff damages, with statutory interest, that are necessary and proper to compensate her for the discrimination, harassment, and hostile work environment, including but not limited to: back pay, front pay, past lost wages, future lost wages, lost pay increases, lost pay incentives,

        negative tax consequences, and lost benefits, injury to professional development, emotional well-being, humiliation, medical bills and expenses and physical and mental pain and suffering;

d.    Award Plaintiff damages for past, present and future physical and mental pain and suffering;

e.    Award Plaintiff liquidated damages in the amount of double all damages awarded;

f.    Award Plaintiff punitive damages;

g.    Award Plaintiff her reasonable attorney fees and costs: and,

h.    Grant such other relief as the Court deems just, proper and equitable;

all of which is in excess of $150,000.00.

        Respectfully submitted,

        s//Edith A. Pearce
        Edith A. Pearce, Esquire
        Attorney for Plaintiff
        The Pearce Law Firm
        1601 Sansom Street, Suite 2C
        Philadelphia, PA 19103
        (215) 557-8686